# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JASON DEVAUGHN SCOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 22-1036-CJB |
| | ) |
| MARTIN O'MALLEY, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant.[1] | ) |

Gary Linarducci, LINARDUCCI & BUTLER, PA, New Castle, DE; Karl E. Osterhout, OSTERHOUT BERGER DISABILITY LAW, Oakmont, PA, Attorneys for Plaintiff.

David C. Weiss, United States Attorney; Shawn C. Carver, Special Assistant United States Attorney; Brian C. O'Donnell, Associate General Counsel, SOCIAL SECURITY ADMINISTRATION, Baltimore, MD, Attorneys for Defendant.

**MEMORANDUM OPINION**

November 18, 2024
Wilmington, Delaware

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Federal Rule of Civil Procedure 25(d), Martin O'Malley is substituted for former Acting Commissioner of Social Security Kilolo Kijakazi, who was originally named as Defendant in this suit.

*Christopher J. Burke*
**BURKE, United States Magistrate Judge**

Plaintiff Jason Devaughn Scott ("Scott" or "Plaintiff") appeals from a decision of Defendant Martin O'Malley, the Commissioner of Social Security ("the Commissioner" or "Defendant"), denying Scott's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA") and supplemental security income ("SSI") benefits under Title XVI of the SSA. *See* 42 U.S.C. §§ 401-34 & 1381-1383f. The Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Scott and the Commissioner (the "motions"). (D.I. 13; D.I. 17) Scott asks the Court to reverse the Commissioner's decision and remand to the Commissioner for further proceedings. (D.I. 14 at 20) The Commissioner opposes that request and asks that the Court affirm his decision. (D.I. 18 at 2) For the reasons set forth below, Scott's motion for summary judgment will be GRANTED-IN-PART and DENIED-IN-PART, the Commissioner's cross-motion for summary judgment will be GRANTED-IN-PART and DENIED-IN-PART and the case will be REMANDED to the Commissioner for further proceedings consistent with this opinion.[2]

**I.      BACKGROUND**

   **A.      Procedural Background**

On April 18, 2018, Scott applied for DIB and SSI benefits, alleging that disability began on May 1, 2015. (D.I. 9 (hereinafter "Tr.") at 223) His claim was denied initially and then again upon reconsideration. (*Id.*) Scott then filed a request for an administrative hearing. (*Id.*) On

---

[2]      On December 16, 2022, the parties consented to the Court's jurisdiction to conduct all proceedings in this action, including entry of a final judgment. (D.I. 11)

October 1, 2019, a hearing was held before an administrative law judge ("ALJ"), at which Scott was represented by counsel. (*Id.*)

On October 28, 2019, the ALJ issued a decision denying Scott's request for benefits. (*Id.* at 223-40) Scott requested review of the ALJ's decision by the Appeals Council; the Appeals Council granted his request and remanded his case back to the ALJ, instructing her to, *inter alia*, consider certain medical evidence. (*Id.* at 15) On March 23, 2021, the supplemental hearing on remand was held. (*Id.* at 46) On May 12, 2021, the ALJ again denied Scott's claims. (*Id.* at 15-38) On June 22, 2022, the Appeals Council denied Scott's request for further review. (*Id.* at 1-5) Thus, the ALJ's May 12, 2021 decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955 & 404.981; *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On August 5, 2022, Scott filed a Complaint in this Court seeking judicial review of the ALJ's decision. (D.I. 2) On January 24, 2023, Scott filed his motion for summary judgment. (D.I. 13) The Commissioner opposed Scott's motion and filed a cross-motion for summary judgment on March 23, 2023. (D.I. 17) On March 31, 2023, Scott filed a Notice standing on his opening brief and indicating that he would not be filing a responsive brief. (D.I. 19)

### B.     Factual Background

At all times relevant to the ALJ's adjudication, Scott was a younger individual. (*See* Tr. at 37) He is a high school graduate, (*id.*), and at the time of his hearings had past work experiences as an insurance clerk, claims clerk, collection clerk and home attendant, (*id.* at 36-37).

#### 1.     Mental Health-related Treatment History

Scott alleged that he has been disabled and unable to work since May 1, 2015 due to major depression, posttraumatic stress disorder ("PTSD") and generalized anxiety disorder. (*Id.*

3

at 526, 530)³  Relevant evidence of record regarding those and related conditions is set out below.

On May 7, 2015, Scott attended therapy at the Delaware Family Center.  (*Id.* at 152)  He was angry and resentful due to being separated from his prior job as a result of a lack of grant funding, and he believed that his employer had treated him unfairly.  (*Id.*)  Scott reported that he had consulted with an attorney regarding a wrongful termination claim.  (*Id.*)  He was described by the provider as being "'all over the place'" during the meeting in terms of his communication skills, and he indicated that he had been drinking heavily.  (*Id.*)  Scott's primary care physician had prescribed Celexa (an antidepressant) 20-40 mg daily.  (*Id.*)

Following his termination from his employer, in July and August 2016, Scott treated with Sheila T. Evans, MS at Delaware Guidance Services for Children & Youth, Inc. relating to depression, anxiety and trust issues.  (*Id.* at 694-705, 837-43)  He viewed his termination as wrongful, and the job separation exacerbated his emotional problems; Scott reported contacting several attorneys and agencies for help.  (*Id.* at 694)  Scott was diagnosed with adjustment disorder with depressed mood and was referred to a different agency that treated adults.  (*Id.* at 696, 698)

From September 2016 through October 2017, Scott saw various providers for treatment of his mental conditions at A Center For Mental Wellness, Inc.; those providers included Anna Hoier, Psy.D. and David Nixon, M.D.  (*See, e.g., id.* at 710-17, 726-46, 759-82)  Scott frequently discussed his case against his former employer during these visits.  (*Id.* at 711, 714, 726, 728, 732, 734, 736, 738, 740, 744, 759, 761-63, 765-71, 773-75, 781-82)  He exhibited an "overall

---

³     Scott has no physical impairments.  (Tr. at 63)

pessimistic view" toward resuming employment. (*Id.* at 742) Scott was ultimately diagnosed with major depressive disorder. (*Id.* at 732) Scott reported that past medications included not only Celexa, but also other antidepressants like Zoloft and Wellbutrin; he said he had stopped taking these medications because they made him feel like a zombie. (*Id.* at 760, 775) He was encouraged to find a part time job or start his own business in order to do something more productive than focus excessively on his prior employment situation. (*Id.* at 710, 715, 782) In August 2017, Dr. Hoier wrote a letter regarding Scott's case against his former employer; in the letter, she noted that Scott did not trust people and would continue to "have problems with individuals who have disagreements with him or have direct control over him in a work environment." (*Id.* at 722-23) In October 2017, Scott was discharged from the practice since he chose not to take medication. (*Id.* at 760)

In July 2018 through June 2019, Scott treated with Joseph L.J. Schwartz, Pys.D. (*Id.* at 791-96, 823-24, 844-75) Dr. Schwartz opined that Scott's former employment situation led to PTSD, and that Scott feared ever working again and "apathetic/unresponsive administrators who could be potentially prejudiced against him." (*Id.* at 795) Scott continued to report feeling angry and depressed regarding his case, and discussed getting an investigative reporter and "newspaper guy" involved. (*Id.* at 844-45, 848, 850, 852, 854, 856, 858, 860, 862)

From November 2019 through February 2021, Scott visited Melissa Forbes, LCSW regarding his anxiety disorder, major depressive disorder and PTSD. (*Id.* at 934-1004) Scott reported suffering from stress related to discrimination on the job and fear of employers. (*Id.* at 1004) Scott also saw an "Eye Movement Desensitization and Reprocessing" ("EMDR") therapist from December 2020 through February 2021. (*Id.* at 1009-29)

    2.    **Medical Opinion Evidence**

On August 20, 2015, Rachel Brandenburg, Psy.D. performed a psychological evaluation of Scott on behalf of the state agency for disability determination purposes. (*Id.* at 139-46) Scott reported that he was seeking benefits because he would never find a job due to "'trust issues'" and that he was a victim of discrimination at previous employers. (*Id.* at 141) Dr. Branderburg diagnosed Scott with personality and mood disorder. (*Id.* at 145) She found a moderate degree of impairment in Scott's ability to sustain work performance and attendance in a normal work setting, which she noted was likely to deteriorate over time due to his level of suspiciousness. (*Id.* at 146)

On March 22, 2017, Scott's treating psychologist Dr. Hoier completed a Health Assessment Form in which she indicated that Scott could not have interactions with bosses who tend to be irritable or intolerant. (*Id.* at 707) She found that he could not deal with constructive feedback and could not participate in small group settings or training and education programs. (*Id.*)

On June 20, 2018, Joseph Keyes, Ph.D. performed another psychological evaluation of Scott on behalf of the state agency for disability determination purposes. (*Id.* at 783-90) Dr. Keyes noted that Scott exhibited moderate clinical symptoms of depression with comorbid anxious distress. (*Id.* at 786) Dr. Keyes found moderate degrees of impairment in Scott's ability to relate to others, sustain work performance and attendance in a normal work setting, and cope with pressures of ordinary work. (*Id.* at 788-89)

On June 30, 2018, Patricia Miripol, Ph.D. evaluated Scott's mental health treatment records. (*Id.* at 184-90) She found moderate limitations in Scott's ability to interact with the general public, accept instructions and respond to criticism from supervisors and get along with coworkers. (*Id.* at 188) She additionally determined that Scott was moderately limited in his

ability to respond appropriately to changes in the work setting and the ability to set realistic goals or make plans independently of others. (*Id.* at 189) Dr. Miripol noted that Scott has no history of intensive mental health treatment and concluded that he would "probably do best in a more solitary work setting." (*Id.*; *see also id.* at 186 (recommending that Scott "should be able to return back to work in [a] solitary work environment")) Dr. Miripol's opinion was affirmed by Alex Siegel, Ph.D. on August 28, 2018. (*Id.* at 206)

On October 31, 2018, Scott's treating psychologist Dr. Schwartz completed a Health Assessment Form in which he indicated that Scott could not follow verbal directions, be punctual or participate in training and education programs. (*Id.* at 798-99) Dr. Schwartz further found that Scott was limited in his ability to participate in a small group setting, deal with constructive feedback, demonstrate insight into problems and follow written directions. (*Id.*) On March 26, 2019, Dr. Schwartz completed a Psychological Functional Compacity form in which he indicated that Scott did not have the ability to perform simple, repetitive work for 40 hours per week without missing more than two days of work per month, due to poor focus, motivation and concentration. (*Id.* at 811) According to Dr. Schwartz, Scott was "too upset" to be in the workplace. (*Id.*) Dr. Schwartz opined that Scott was severely limited in his abilities to relate to other people, engage in daily activities, sustain work performance and attendance in a normal work setting and cope with the pressures of ordinary work. (*Id.* at 812-13)

   **3. The Administrative Hearing**

At the administrative hearing held on March 23, 2021 following remand, the ALJ heard Scott's testimony and that of Christina Beatty-Cody, an impartial Vocational Expert ("VE"). (*Id.* at 46-79)

   **a. Scott's Testimony**

Scott testified that he began taking a polysomnography class in September 2020 (which consisted of two in-person classes with the remaining classes taken virtually), but he stopped going around November 2020 due to his PTSD and inability to concentrate. (*Id.* at 52-53) In the midst of answering general questions about his past work history, Scott began crying because it "brings back flashbacks and memories of how [he] was treated unfairly[.]" (*Id.* at 56-57) He explained that his most recent employment was driving for Uber from February 2020 until December 2020, when he stopped because he could not handle dealing with frustrated customers. (*Id.* at 58, 71) Scott testified that he has a "fear of going back to work" and that "[y]ou can't force somebody out there to work that's been discriminated against." (*Id.* at 64-65)

        **b.**      **Vocational Expert's Testimony**

VE Beatty-Cody also testified during the hearing. The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and experience who:

> is able to remember, understand and carry out simple instructions and cannot work at a production pace, such as assembly line work; is able to make simple, work-related decisions; tolerate few changes in a routine work setting; is able to interact with supervisors and coworkers frequently; only occasionally work in tandem with others; and occasionally interact with the public; would such an individual be able to perform the Claimant's past work?

(*Id.* at 72) To the ALJ's question as to whether such an individual would be able to perform Scott's past work, the VE responded in the negative. (*Id.*) The ALJ then asked the VE if there are any other occupations in the national economy that such an individual could perform. (*Id.*) The VE responded that such an individual could perform work as a mat packer, router or sorter. (*Id.* at 72-73) The VE explained that her response would not be impacted if the hypothetical

8

individual were only occasionally able to interact with supervisors, coworkers and the public. (*Id.* at 73)[4]

### c.  The ALJ's Findings

On May 12, 2021, the ALJ issued her decision following remand, ultimately denying Scott's request for benefits. (*Id.* at 15-38) She decided in Scott's favor at steps one and two,[5] finding that Scott has not engaged in substantial gainful activity since the alleged disability onset date and that he has the following severe impairments: PTSD, Generalized Anxiety Disorder, Major Depressive Disorder, Unspecified Mood Disorder, Adjustment Disorder with Depressed Mood, and Alcohol Use Disorder. (*Id.* at 18) At step three, the ALJ found that Scott's impairments were not equivalent to an impairment presumed severe enough to preclude any gainful work. (*Id.* at 18-23) At step four, the ALJ concluded that Scott has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following non-exertional limitations:

> the claimant can remember, understand, and carry out simple instructions, but not at a production pace. He is limited to simple work-related decisions; few changes in a routine work setting; frequent interaction with supervisors and coworkers during the

---

[4]  Scott's counsel also questioned the VE. In response to a question about how much interaction the hypothetical individual working in the jobs the VE had listed would have to have with his supervisor during a probationary period, the VE explained that those jobs are learned by modeling, and so the level of interaction with supervisors is not necessarily going to increase during a probationary period—unless the supervisor happens to be doing the training (which happens 35-40% of the time). (Tr. at 75; *see also id*. at 119) In response to questioning, the VE also testified that if the individual "can tolerate no changes in a routine work setting[,]" there is not work available for such a person in the national economy. (*Id.* at 73) The VE also opined that an employer's tolerance for off-task behavior is less than 15% of the workday above and beyond typically allowed breaks, and that an employer would tolerate one absence or less per month, and that would include arriving late or leaving early. (*Id.* at 73-74)

[5]  The steps in the ALJ's analysis will be described more fully in the "Legal Standards" section below.

> training or probationary period, but only occasional interaction with supervisor and coworkers after the training or probationary period; and only occasional interaction with the public. . . .

(*Id.* at 23-36) The ALJ found that Scott could not be expected to return to his past work. (*Id.* at 36-37) But at step five, the ALJ determined that there were jobs available in the national economy that the claimant could perform, consistent with the Scott's age, education, work experience and RFC (like the jobs of mat packer, router and sorter). (*Id.* at 37-38)

## II.    LEGAL STANDARDS

Courts have plenary review regarding the Commissioner's legal conclusions. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). The Court must uphold the Commissioner's factual findings if they are supported by "substantial evidence[.]" *See* 42 U.S.C. § 405(g); *Sykes*, 228 F.3d at 262. "Substantial evidence" may be less than a preponderance of the evidence but must be more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotation marks and citation omitted). In analyzing whether substantial evidence supports the Commissioner's factual findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). Even if the reviewing Court would have decided the factual inquiry differently, it must defer to the ALJ and affirm the Commissioner's decision, so long as the decision is supported by substantial evidence. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190-91.

In determining whether a person is disabled,[6] the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R §§ 404.1520 & 416.920; *see also Russo v. Astrue*, 421 F. App'x 184, 188 (3d Cir. 2011). The United States Court of Appeals for the Third Circuit has explained this sequential analysis, and the shifting burdens with respect to each step, in detail:

> The first two steps involve threshold determinations. In step one, the Commissioner must determine whether the claimant currently is engaging in substantial gainful activity. [] If a claimant is found to be engaging in substantial gainful activity, the disability claim will be denied. [] In step two, the Commissioner must determine whether the claimant has a medically severe impairment or combination of impairments. [] If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. [] In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. [] If the impairment is equivalent to a listed impairment the disability claim is granted without further analysis. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. [] Step four requires the ALJ to consider whether the claimant retains the [RFC] to perform his past relevant work. The claimant bears the burden of demonstrating an inability to return to his past relevant work. [] If the claimant does not meet the burden the claim is denied.
>
> If the claimant is unable to resume his former occupation, the evaluation moves to the final step. [] At this stage, the burden of production shifts to the Commissioner, who must demonstrate the

---

[6] A "disability" is defined for purposes of DIB and SSI as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A); *see also Tate v. Berryhill*, C.A. No. 15-604-LPS, 2017 WL 1164525, at *5 (D. Del. Mar. 28, 2017). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003); *Tate*, 2017 WL 1164525, at *5.

> claimant is capable of performing other available work in order to deny a claim of disability. [] The Commissioner must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his or her medical impairments, age, education, past work experience, and residual functional capacity. [] The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he is capable of performing work and is not disabled.

*Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (internal citations omitted).

The analysis is identical whether an application seeks DIB or SSI. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 n.3 (3d Cir. 2004).

## III. DISCUSSION

On appeal, Scott argues that the ALJ's RFC determination failed to account for greater limitations that were plainly established in the relevant medical opinions—and that such limitations would rule out Scott's ability to perform full-time work. (D.I. 14 at 15) A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1); *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 202 (3d Cir. 2019). In crafting a claimant's RFC, the ALJ must consider all evidence before her and must "give some indication of the evidence which [s]he rejects and h[er] reason(s) for discounting such evidence." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000). An ALJ must include all credibly established limitations in both the hypothetical question posed to the VE and in her RFC assessment. *See Watson v. Saul*, C.A. No. 18-880 (MN), 2020 WL 2737012, at *10-11 (D. Del. May 26, 2020). "The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate . . . RFC determination[]." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

Below, the Court will first explain why one of Scott's challenges requires remand. Then it will address Scott's remaining arguments, explaining why they do not.

### A. Scott's limitations regarding interaction with others

In her decision, the ALJ made the following findings with respect to Scott's ability to interact with others:

- Scott has "no more than a marked limitation"[7] in his ability to interact with others, as supported by, *inter alia*, Scott's testimony that he does not get along with bosses well, was observed becoming verbally aggressive on the phone when his needs could not be met, has cursed at and hung up on his therapist, has been observed by his providers as having intense eye contact and pressured or rapid speech, and has a low frustration tolerance in dealing with others and their unresponsiveness. (Tr. at 20);[8]

- While Dr. Keyes indicated that Scott was moderately limited in his ability to interact with others, "a more restrictive limitation in the claimant's ability to interact with others is warranted" based on the record, such as treatment notes indicating that Scott has a "low frustration tolerance in dealing with others and their unresponsiveness[.]" (*Id.* at 22) Instead, a "marked limitation" in Scott's ability to interact with others was consistent with his "documented history of difficulty handling situations where he believes others are being inconsiderate or discriminatory[.]" (*Id.* at 23)

---

[7] A "marked" limitation is a limitation that is "more than moderate" but "less than extreme." *Vargas v. Berryhill*, CIVIL ACTION NO. 18-1121, 2019 WL 3002958, at *2 (E.D. Pa. July 10, 2019).

[8] The ALJ explained that Scott's limitation in interacting with others does not rise to an "extreme" level, in light of: (1) his activities of daily living, including the facts that he resides in a home with his family, is able to travel alone, shops in stores once or twice a month, attends church and family gatherings and gets along with family and friends; (2) medical evidence indicating that, at an examination with Dr. Keyes, Scott maintained eye contact, answered questions and initiated conversation; and (3) engaged an investigative reporter in relation to his case against his former employer. (Tr. at 20)

- "[T]he medical evidence of record supports some limitations related to the claimant's ability to interact with others, including supervisors[.]" (*Id.* at 34)

- Dr. Schwartz opined that Scott had a severe limitation in relating to other people, and "the opined severe limitation in the claimant's ability to interact with others [is] persuasive as it is consistent with the medical evidence of record [and] is reflected in the [RFC] which provides that the claimant can tolerate occasional interaction with supervisors and coworkers after probationary period. Such a limitation is supported by the claimant's current work as an Uber driver, which requires less interaction with people." (*Id.* at 34-35)[9]

In sum, in her decision, the ALJ: (1) concluded that Scott had more than a "moderate" and no more than a "marked" limitation in his ability to interact with others; and (2) at least once noted that it was "persuasive" that Scott had a "severe" limitation in interacting with other people. And yet, as is also described above, the ALJ's RFC calls for "*frequent* interaction with supervisors and coworkers during the training or probationary period" (to be followed by "only occasional interaction with supervisors and coworkers" after that period). (*Id.* at 23 (emphasis added))

In light of this—and in the absence of any other explanation from the ALJ on this point—the Court is uncertain how it is that Scott would be able to engage in "frequent" interaction with supervisors and coworkers during the initial training period required for the positions that the

---

[9] This particular finding—i.e., that Dr. Schwartz's opinion that Scott has a "severe" limitation in his ability to interact with others was "persuasive"—seems to be in some conflict with an earlier statement in the ALJ's decision. In that earlier portion of the decision, the ALJ had written that she was "not persuaded by Dr. Schwartz's opinion that the claimant could have a severe limitation in relating to other people, as such a restrictive limitation is inconsistent with the medical evidence of record"—such as evidence indicating Scott's ability to attend church and family gatherings, to engage an investigative reporter regarding his case against his former employer and attend the polysomnography class. (Tr. at 29; *see also* D.I. 14 at 20)

ALJ said that he could work in.  (D.I. 14 at 19-20)  As another Court faced with a similar scenario put it:

> To wit, how could it be that, when the Plaintiff commences a job and requires 30 days of training, she can frequently interact with strangers and yet, after the 30 days elapse, be only able to tolerate occasional interaction with those same people?  The ALJ [who had found that the plaintiff's interactions with others must be restricted] never explains how he arrived at this facially illogical decision.

*Yazmin Q. v. O'Malley*, CIVIL ACTION NO. 24-1531, 2024 WL 4567277, at *5-6 (E.D. Pa. Oct. 24, 2024); *see also, e.g.*, *S.B. v. Comm'r of Soc. Sec.*, Civil No. 20-14192 (RBK), 2022 WL 16701880, at *3 (D.N.J. Feb. 15, 2022) (remanding where the ALJ assessed moderate social limitations in the plaintiff's ability to interact with others, but crafted an RFC in which plaintiff "maintains contact frequently with supervisors and coworkers while successfully completing a 30-day training period" and "[a]fter successful completion of the training period, maintains contact with supervisors and coworkers occasionally"; the court noted that the ALJ's decision lacked an "explanation connecting evidence with the 30-day training period" such that "[i]t is not clear from the decision or record where the 30-day period, an exception to the general limitation of restricted social interaction, came from or what evidence supports it"); *Weber v. Saul*, No. 19-cv-448-wmc, 2021 WL 99988, at *6-7 (W.D. Wis. Jan. 12, 2021) (remanding a case where "the ALJ here *found that Weber had marked* limitations in interacting with others" and accordingly "limited plaintiff to 'no more than occasional direct interaction with supervisors, coworkers, and the public,' but inexplicably carved out an initial training period, during which she found Weber *could* tolerate 'frequent or constant contact with supervisors or coworkers'"—without providing "any explanation" as to why she believed that the claimant could tolerate frequent or constant contact with others during a training period) (emphasis in original) (internal citation omitted).

Therefore, this case will be remanded for the ALJ to sufficiently explain her finding that Scott could tolerate frequent contact with supervisors and coworkers during a training period (in light of her conclusion that Scott had at least marked limitations in interacting with others).

Scott further challenges two other aspects of the ALJ's decision. For the reasons discussed below, the Court is not persuaded that these issues require remand.

### B.     Failure to require a solitary work setting

Scott next attacks the ALJ's failure to include in the RFC Dr. Miripol's finding that Scott needs to be in a solitary work setting, due to Scott's social interaction limitations and difficulty coping with stress. (D.I. 14 at 16-18 (citing Tr. at 189)) Scott contends that a limitation for a "solitary work setting" is more restrictive than any limitation in the ALJ's RFC, and that the ALJ failed to explain why she omitted it. (*Id.* at 16)

The Commissioner retorts that Scott is taking Dr. Miripol's opinion regarding a solitary work setting out of context. (D.I. 18 at 11) And the Court agrees. While Dr. Miripol opined that Scott "*will probably do best* in a *more* solitary work setting[,]" (Tr. at 189 (emphasis added)), this is not an unequivocal conclusion that Scott *must only* work in a solitary setting.[10] Instead, it is a reference to what might be an *optimal* environment for Scott. The ALJ thus was not required to expressly address this statement or include a "solitary work only" requirement in the RFC. *See, e.g., Murr v. Comm'r of Soc. Sec.*, Case No. 3:23-CV-01256-JJH, 2024 WL 1531432, at *7 (N.D. Ohio Mar. 1, 2024) (rejecting the claimant's argument that the RFC conflicted with the psychological consultative examiner's opinion that the claimant's "ability to

---

[10]     Relatedly, Dr. Miripol had concluded that Scott's ability to interact appropriately with the public and get along with coworkers without distracting them or exhibiting behavioral extremes was only moderately limited. (Tr. at 188)

cope with the stress and pressures associated with day-to-day basic work activity would not be compromised in a solitary position" because that opinion "seems to set forth an optimal situation for [c]laimant but does not establish that she would be incapable of performing in other situations" and thus "further explanation by the ALJ was not required") (internal quotation marks and citations omitted); *Jones v. Berryhill*, CV 117-106, 2018 WL 6537154, at *5 (S.D. Ga. Nov. 19, 2018) ("While [consulting psychologist] Dr. Whitley opined Plaintiff 'may function best with solitary work,' . . . he did not indicate Plaintiff would be incapable of interacting with supervisors or coworkers . . . [and thus] the ALJ's decision not to impose these additional limitations is supported by substantial evidence."), *report and recommendation adopted*, 2018 WL 6531660 (S.D. Ga. Dec. 12, 2018).

### C. Treatment of certain limitations found by Dr. Hoier and Dr. Schwartz

Finally, Scott also contends that the ALJ rejected Dr. Hoier's and Dr. Schwartz's opinions (the "opinions at issue") that Scott is "unable to participate in a small group setting, deal with constructive feedback, be punctual and keep a schedule, follow verbal directions, participate in training and/or education program, or interact with bosses[] who tend to be irritable or intolerant"—all without properly explaining why she was doing so. (D.I. 14 at 18-20) The Court again does not agree.

As an initial matter, the ALJ expressly recited these findings and then went on to explain why, in her view, these limitations were inconsistent with the medical evidence and were not supported by Scott's treatment records. (Tr. at 33-34) In explaining why this was so, the ALJ cited to one example from the record: i.e., she noted that "the opinion that the claimant would be unable to deal with constructive feedback is [in]consistent with the claimant's ongoing

relationship with his therapist and the constructive instruction she provides[.]" (*Id.* at 34)[11] On appeal, Scott takes issue with this statement by highlighting one instance where Scott cursed at his therapist and hung up on her, after she suggested that he "needed to be open to justice being other things" beyond his lawsuits. (D.I. 14 at 18 (citing Tr. at 963)) To be sure, there is record evidence that Scott did not always take feedback well from his therapists. (Tr. at 32 (ALJ noting some such examples); *see also id.* at 774, 782) But there is *also* evidence that supports the ALJ's statement that Scott could be open and responsive to constructive feedback from his providers. (*See, e.g.*, Tr. at 30 (Scott attending EDMR sessions recommended by his provider) (citing *id.* at 1013, 1021); *id.* at 31 (therapist encouraging Scott to engage in deep breathing, and Scott reporting that he had been using relaxation techniques and other coping skills regularly and would try to continue to do so) (citing *id.* at 936)). And so the ALJ's statement above regarding her view as to this "feedback" issue was supported by substantial evidence.[12]

Beyond that specific portion of the ALJ's decision, other aspects of the decision address limitations relating to the opinions at issue. These aspects show that the ALJ sufficiently explained why she did not fully agree with the opinions at issue, and otherwise demonstrate how the ALJ took a nuanced approach to Scott's limitations in these regards:

- For instance, elsewhere the ALJ explained that she was not persuaded by Dr. Schwartz's opinion that Scott had a moderately severe limitation in his ability to understand simple instructions, as it was inconsistent with: (1) mental status examinations that routinely assessed Scott with intact memory; and (2) the fact that Scott had been actively handling various

---

[11]   The ALJ used the word "consistent" in this portion of her decision, but it is clear in context that "inconsistent" was the word the ALJ intended to use. (D.I. 14 at 18)

[12]   The Court notes that while Dr. Hoier found that Scott could not deal with constructive feedback, Dr. Schwartz only found him only to be "[l]imited" in this area. (Tr. at 707, 799)

    matters relating to his case against his former employer. (*Id.* at 29 (citations omitted)) Nevertheless, the ALJ noted that Scott was "moderate[ly]" limited in his ability to understand, remember or apply information, which she explained was consistent with Dr. Keyes' examination. (*Id.* at 23) The ALJ also found that Scott was "moderate[ly]" limited in his ability to adapt or manage himself, noting that Scott has traveled to Philadelphia, engaged an investigative reporter regarding his case and handled various matters relating to his case (albeit while becoming overwhelmed at times). (*Id.* at 21-22, 23) This record evidence (along with Scott's testimony that school and work were overwhelming, and the evidence indicating that Scott had an above-average IQ) led the ALJ to find that the RFC should include "[an RFC] limitation to remember, understand and carry out simple instructions, but not at a production pace, with only simple work related decisions, and few changes in a routine work setting[.]" (*Id.* at 32-33)

- As for these doctors' findings that Scott could not interact with irritable bosses, the ALJ agreed that the record supported "some limitations" in Scott's ability to interact with others, including supervisors. She noted that she had included such limitations in the RFC (i.e., the limitation that he have "only occasional interaction with supervisors and coworkers" after a training or probationary period). (*Id.* at 34)

- Finally, the ALJ later describes another doctor's opinion that Scott would be unable to remain "on task" at least 80% of the day, explaining that it was internally consistent with that doctor's opinion that Scott "only has a moderate limitation in his ability to sustain work performance and attendance in a normal work-setting." (*Id.* at 35-36; *see also id*. at 906-07)

    For these reasons, the ALJ's consideration of the opinions at issue of Dr. Hoier and Dr. Schwartz was based on the objective medical evidence and other evidence in the record. The ALJ's ultimate findings are not required to align perfectly with a medical opinion of record, *see, e.g.*, *McNeal v. O'Malley*, Civil Action No. 23-350-SRF, 2024 WL 1406527, at *6 (D. Del. Apr. 2, 2024), and the Court is not permitted to assess the case with fresh eyes and substitute its own judgment in place of the ALJ's consideration of the record evidence, *see Gaddis v. Comm'r of*

*Soc. Sec.*, 417 F. App'x 106, 107 n.3 (3d Cir. 2011) ("Where the Commissioner's findings of fact are supported by substantial evidence, courts are bound by those findings even if they would have decided the factual inquiry differently—*i.e.*, we are not permitted to weigh the evidence or substitute our own conclusions for those of the fact-finder."). Thus—with the exception of the RFC's allowance for frequent interaction with supervisors and co-workers during an initial training period followed by only occasional such interaction (as discussed above)—the Court finds that substantial evidence supports the challenged portions of the ALJ's decision.

### III.  CONCLUSION

For the reasons set forth in this Memorandum Opinion, Scott's motion for summary judgment is GRANTED-IN-PART and DENIED-IN-PART and the Commissioner's cross-motion for summary judgment is GRANTED-IN-PART and DENIED-IN-PART. The case is REMANDED for further proceedings consistent with this opinion. An appropriate Order will issue.